**HORNSBY OIL COMPANY, INC.,
Plaintiff-Appellee Cross-Appellant,**

v.

**CHAMPION SPARK PLUG COMPANY,
INC., Defendant-Appellant
Cross-Appellee.**

No. 81–2383.

United States Court of Appeals,
Fifth Circuit.

Sept. 23, 1983.

Rehearing Denied Oct. 19, 1983.

Rufus W. Oliver, III, N.K. Alexander, Jr., Houston, Tex., Donald F. Melhorn, Toledo, Ohio, for defendant-appellant cross-appellee.

Wayne H. Paris, Houston, Tex., for plaintiff-appellee cross-appellant.

Before GARZA, POLITZ and JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Hornsby Oil Company, Inc. (Hornsby) sued Champion Spark Plug Company, Inc. (Champion) under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, claiming that Champion unlawfully terminated its distributorship due to its noncompliance with territorial and product restrictions, and monopolized, conspired to monopolize and attempted to monopolize the market in automotive replacement spark plugs. Champion counterclaimed, seeking payment of $27,961.01 for goods sold to Hornsby in February 1976. Following a lengthy trial, the magistrate[1] denied defendant's motion

---

1. Upon the consent of the parties, this action was tried by the magistrate according to the procedure outlined in 28 U.S.C. § 636(c). To facilitate discussion, the magistrate shall be

for directed verdict and submitted the case to the jury on a general charge and special interrogatories. The magistrate entered judgment in favor of Hornsby in the amount of $225,000 after trebling, plus interest and attorneys' fees, based on the jury's finding that Hornsby's termination resulted from its refusal to deal exclusively in Champion products. Judgment was also rendered for defendant on its counterclaim, in accordance with the jury's affirmative answer regarding its right to recovery on open account. Both parties appeal. Concluding that the magistrate improperly charged the jury on the elements of Hornsby's section 1 claim, we reverse and remand for a new trial on that claim.

### Facts

Champion, a Delaware corporation with its principal place of business in Ohio, is engaged in the manufacture and sale of spark plugs to independent wholesalers, or "warehouse distributors," throughout the country. These distributors in turn market the product to retailers, independent jobbers, or such quantity consumers as the operators of fleets of vehicles. Under Champion's system of functional pricing, warehouse distributors are charged a gross price per plug equal to the manufacturer's suggested resale price. The prices at which Champion sells its product to distributors are subject to two percentage discounts, or allowances, designed to reimburse the latter for their performance of warehousing and marketing duties. A functional allowance represents Champion's compensation to each distributor for maintenance of an adequate supply of plugs to satisfy the demands of customers in the particular area served. Distributors who aggressively pro-

mote the sale of Champion plugs to qualified jobbers or wholesaler accounts are also entitled to a warehouse allowance. Until 1980, distributors claiming the warehouse allowance were required to submit monthly reports setting forth the volume of jobber sales, and identifying the names and locations of these customers.

Champion maintains a national distribution network pursuant to which the United States is divided geographically into sales regions and districts. Houston, Texas and 15 to 20 neighboring counties constitute Champion District No. 44, also known as the Houston Sales District. During the relevant period, Steven Bastean was responsible, as Regional Sales Manager, for sales and promotional activities within a multi-state region encompassing several districts, including Champion District No. 44. As Sales Manager for this district, Earl Moeller supervised such activities directly and reported to Bastean.

Hornsby, located in Conroe, Texas, is an independent marketer of motor oil, lubricants, spark plugs and other automotive replacement parts. In late 1974 or early 1975, Hornsby's president, Shirley Hornsby, began discussions with Bastean concerning her company's acquisition of a Champion distributorship. At that time, Hornsby sold a competing line of spark plugs produced by Ford Motor Company's Autolite Division.[2] Because defendant then had no authorized distributor in the area serviced by Hornsby, its representatives felt Champion would benefit from the proposed distributorship.

Moeller and Shirley Hornsby met at plaintiff's Conroe facility on March 4, 1975, and executed a distributorship agreement.[3]

referred to interchangeably as "the court" and "the magistrate."

**2.** Once a trademark of the Ford Motor Company, the term "Autolite" is now owned by the Bendix Corporation. Ford presently affixes the trademark "Motorcraft" to all automotive parts, including its line of spark plugs.

**3.** Testimony concerning the details of this meeting, attended by Shirley Hornsby, her secretary, Patricia Vela, and Moeller, and the par-

ties' understanding of the terms of the distributorship contract, is in sharp conflict. According to Shirley Hornsby and Patricia Vela, Moeller indicated that the contract barred the sale of competing spark plug lines, and restricted Hornsby from operating in "Houston, Harris County, Texas." Moeller denied this assertion. Both women testified that Moeller did not permit Ms. Hornsby to read the contract prior to signing, whereas Moeller stated that each of the signatories reviewed a copy of the document in the course of this meeting. Ms. Horns-

The agreement imposed neither an express nor an implied obligation upon Hornsby to deal exclusively in Champion products. Either party could rescind the agreement on 30 days' written notice. In the event of Hornsby's default or breach, or a subsequent change in its ownership or management, Champion had the right to terminate the agreement immediately by written notice.

Notwithstanding the express contractual disclaimer of an exclusive dealing requirement, Ms. Hornsby testified that Moeller conditioned Hornsby's acceptance as a Champion distributor on its elimination of the Autolite line of spark plugs. Champion representatives in turn testified that while the company strongly advocated single line selling by its distributors and attempted to persuade them of the economic benefits to be gained therefrom, it had not enforced a policy of exclusivity. Although Hornsby gradually began to reduce its inventory of Autolite plugs, it was not until December 1975 that Ms. Hornsby formally cancelled her company's agreement with Ford relating to Autolite and Motorcraft products. Ford accepted Hornsby's cancellation notice on April 22, 1976.

Some time after the execution of the Champion distributorship agreement, Moeller learned that certain monthly sales reports, filed by Hornsby in order to obtain warehouse allowances, falsely listed a large volume of plug sales to a Texas City customer. In accordance with his normal procedure Moeller audited Hornsby's account, but because of Hornsby's falsification of company invoices was unable to determine the true identities of the customers. Despite Moeller's subsequent admonition to Ms. Hornsby to cease the submission of false sales reports, Hornsby continued to do so. Ms. Hornsby testified that these evasive maneuvers were designed to conceal sales to jobbers within the proscribed Houston territory.

Moeller eventually informed Bastean of Hornsby's penchant for false reporting, and recommended cancellation of the distributorship. After verifying that several entries in Hornsby's reports were inaccurate, Bastean met with Shirley Hornsby in December 1975. In the course of this meeting Ms. Hornsby admitted falsifying warehouse allowance claims. Shortly thereafter, Champion severed its relationship with Hornsby, effective in February of 1976. Before the effective date, but subsequent to its receipt of the termination notice, Hornsby purchased approximately $28,000 worth of spark plugs from Champion. On the advice of counsel, Hornsby refused to pay for this merchandise.

Hornsby then filed the instant suit, contending that termination of its distributorship was precipitated by its nonadherence to geographic and exclusive dealing restrictions, and was hence violative of section 1 of the Sherman Act. This conduct was also challenged under section 2 of the Act as constituting a monopoly of, and an attempt and conspiracy to monopolize, the automotive replacement spark plug market. By way of response to plaintiff's allegations, Champion denied engaging in the exclusionary practices charged, averred that Hornsby's termination was predicated on its false reporting rather than any anticompetitive motive on the part of the manufacturer, and counterclaimed for the purchase price of the February 1976 shipment of spark plugs. At the close of the evidence, the court submitted the case to the jury pursuant to the special verdict procedure of Fed. R.Civ.P. 49(a).[4] In answer to special inter-

by testified that her acquiescence in the exclusivity policy, as explained by Moeller, was dependent upon Champion's confirmation of Hornsby's appointment. Again, Moeller disputed this version of their exchange.

4. Reproduced herein is the text of the special interrogatories, along with the jury's answer to each interrogatory:

SPECIAL INTERROGATORIES VERDICT

1. Has the plaintiff proved by a preponderance of the evidence that defendant and plaintiff entered into a contract, combination, or conspiracy that required plaintiff to cease dealing in competitive lines of spark plugs as a condition of obtaining or keeping a direct Champion distributorship, thereby unreasonably restraining a not insubstantial amount of interstate commerce?

Answer: Yes

[If your unanimous answer to Interrogatory # 1 was "Yes" then consider and answer Interrogatory # 2; if your unanimous answer to Interrogatory # 1 was "No" then do not consider or answer Interrogatories # 2 or # 3 but proceed to consider and answer Interrogatory # 4.]

2. Has the plaintiff proved by a preponderance of the evidence that plaintiff has suffered injury in its business or property as a proximate result of the contract, combination, or conspiracy referred to in Interrogatory # 1?

Answer: No

[If your unanimous answer to Interrogatory # 2 was "Yes" then proceed to consider and answer Interrogatory # 3; if your unanimous answer to Interrogatory # 2 was "No" then do not consider or answer Interrogatory # 3 but instead proceed to consider and answer Interrogatory # 4.]

3. What sum of money, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate plaintiff for the injury to its business or property caused by the contract, combination, or conspiracy referred to in Interrogatory # 1?

Answer: $ ———————————

[Please consider and answer Interrogatory # 4.]

4. Has the plaintiff proved by a preponderance of the evidence that defendant and plaintiff entered into a contract, combination, or conspiracy that restricted plaintiff's distribution of Champion spark plugs to a territorial area which did not include Houston, Harris County, Texas, thereby unreasonably restraining a not insubstantial amount of interstate commerce?

Answer: No

[If your unanimous answer to Interrogatory # 4 was "Yes" then proceed to consider and answer Interrogatory # 5; if your unanimous answer to Interrogatory # 4 was "No" then do not consider or answer Interrogatories # 5 and # 6 but instead proceed to consider and answer Interrogatory # 7.]

5. Has the plaintiff proved by a preponderance of the evidence that plaintiff has suffered injury in its business or property as a proximate result of the contract, combination, or conspiracy referred to in Interrogatory # 4?

Answer: ———————————

[If your unanimous answer to Interrogatory # 5 was "Yes" then consider and answer Interrogatory # 6; if your unanimous answer to Interrogatory # 5 was "No" then do not consider or answer Interrogatory # 6 but instead proceed to consider and answer Interrogatory # 7. Also, please see the note following Interrogatory # 6.]

6. What sum of money, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate plaintiff for the injury to its business or property proximately caused by the contract, combination, or conspiracy referred to in Interrogatory # 4?

Answer: ———————————

[Consider and answer Interrogatory # 7 only in the event you have unanimously answered "Yes" to either Interrogatory # 1 or Interrogatory # 4; if you have unanimously answered "No" to both Interrogatory # 1 and Interrogatory # 4 then do not answer Interrogatories # 7, # 8, or # 9 but instead proceed to consider and answer Interrogatory # 10.]

7. Has the plaintiff proved by a preponderance of the evidence that defendant wrongfully terminated plaintiff's direct Champion distributorship because of plaintiff's failure to abide by the conspiracy agreement between plaintiff and defendant?

Answer: Yes

[If your unanimous answer to Interrogatory # 7 was "Yes" then proceed to consider and answer Interrogatory # 8; if your unanimous answer to Interrogatory # 7 was "No" then do not answer Interrogatories # 8 or # 9 but instead proceed to consider and answer Interrogatory # 10.]

8. Has the plaintiff proved by a preponderance of the evidence that plaintiff has suffered injury in its business or property as a proximate result of defendant's wrongful termination of plaintiff's direct Champion distributorship referred to in Interrogatory # 7?

Answer: Yes

[If your unanimous answer to Interrogatory # 8 was "Yes" then proceed to consider and answer Interrogatory # 9; if your unanimous answer to Interrogatory # 8 was "No" then do not answer Interrogatory # 9 but instead proceed to consider and answer Interrogatory # 10.]

9. What sum of money, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate plaintiff for the injury to its business or property caused by the wrongful termination of its direct Champion distributorship referred to in Interrogatory # 7?

Answer: $75,000.00

[Please consider and answer Interrogatory # 10.]

10. Has the plaintiff proved by a preponderance of the evidence that the "relevant market" (submarket) was the distribution and sale of automotive replacement spark plugs available to direct/warehouse account distributors in the metropolitan Houston area consisting of Harris County, Texas and the immediate surrounding counties approxi-

rogatories, the jury rejected all of plaintiff's antitrust theories except the claim that Champion had combined with Hornsby to form an unlawful exclusive dealing arrangement, and that Hornsby's distributorship had been cancelled because of its decision to withdraw from the arrangement. The jury further determined that the cancellation was a proximate cause of injury to Hornsby's business or property. While finding for Champion on its counterclaim, the jury pared its recovery by $4,669.45 in discounts and allowances due and owing to Hornsby.

Both parties filed motions for judgment on the verdict. Pursuant to Hornsby's motion, the trial judge rendered judgment in its favor in the trebled sum of $225,000 and $49,850 in attorneys' fees, plus interest. The court granted Champion's motion for judgment on its counterclaim, less the $4,669.45 set-off calculated by the jury, coupled with attorneys' fees and interest. With the exception of its request for judg-

mately bordered by Lufkin, Texas to the north, Lake Charles, Louisiana to the east, and Hempsted, Texas to the west, and being comprised more or less, of: Galveston County, Chambers County, Jefferson County, Orange County, Hardin County, Liberty County, Tyler County, Polk County, Angelina County, Walker County, Grimes County, San Jacinto County, Montgomery County, Madison County and other counties comprising Champion Sales District 44?

Answer: <u>No</u>

[If your unanimous answer to Interrogatory # 10 was "Yes" then proceed to consider and answer Interrogatory # 11; if your unanimous answer to Interrogatory # 10 was "No" then do not consider or answer Interrogatories # 11 through # 14 but instead proceed to consider and answer Interrogatory # 15.]

11. Has the plaintiff proved by a preponderance of the evidence that the defendant possessed monopoly power in the relevant market so as to control and dominate interstate trade and commerce in the distribution of automotive replacement spark plugs by intentionally requiring plaintiff to drop competitive lines of spark plug products?

Answer: —————————————————

[Please consider and answer Interrogatory # 12.]

12. Has the plaintiff proved by a preponderance of the evidence that the defendant attempted and specifically intended to monopolize interstate trade and commerce in the distribution of automotive replacement spark plugs by wrongfully requiring plaintiff to drop competitive lines of spark plugs within said relevant market?

Answer: —————————————————

[If your unanimous answer to either Interrogatory # 11 or Interrogatory # 12 was "Yes" then consider and answer Interrogatory # 13. If your answer to both Interrogatory # 11 and Interrogatory # 12 was "No" then do not consider Interrogatories # 13 or # 14 but instead proceed to consider and answer Interrogatory # 15.]

13. Has the plaintiff proved by a preponderance of the evidence that the defendant's monopolization or attempted monopolization directly and proximately caused damage to the business or property of the plaintiff?

Answer: —————————————————

[If your unanimous answer to Interrogatory # 13 was "Yes" then consider and answer Interrogatory # 14; if your unanimous answer to Interrogatory # 13 was "No" then do not consider or answer Interrogatory # 14 but instead proceed to consider and answer Interrogatory # 15.]

14. What sum of money, if any, do you find from a preponderance of the evidence, would fairly and reasonably compensate plaintiff for the injury to its business, or property caused by the monopolization referred to in Interrogatory # 9 or the attempted monopolization referred to in Interrogatory # 10?

Answer: —————————————————

[Please consider and answer Interrogatory # 15.]

15. Has the defendant proved by a preponderance of the evidence that plaintiff ordered $27,961.01 worth of spark plugs and related merchandise from the defendant?

Answer: <u>Yes</u>

[If your unanimous answer to Interrogatory # 15 was "Yes" then consider and answer Interrogatory # 16; if your unanimous answer was "No" you shall not consider any other interrogatory but will return your verdict.]

16. Has the defendant proved by a preponderance of the evidence that plaintiff received and failed to pay for the merchandise referred to in Interrogatory # 15?

Answer: <u>Yes</u>

[Please consider and answer Interrogatory # 17.]

17. What sum of money, if any, do you find from a preponderance of the evidence represents the total amount of discounts and allowances that should be deducted from or credited against the $27,961.01 referred to in Interrogatory # 15?

ment on the full amount of the counterclaim, Champion's subsequent motion for new trial and judgment notwithstanding the verdict were denied. On appeal, Champion challenges the court's instructions and interrogatories, as well as the sufficiency of the evidence. Hornsby appeals from the court's entry of judgment on the counterclaim, and the earlier denial of its summary judgment motion.

### Champion's Appeal

Champion mounts a sweeping attack upon the instructions and special interrogatories given or rejected by the trial judge. First, defendant contends that the instructions and the special verdict form are fatally flawed, in that they fail to provide the legally-mandated framework for measurement of the market impact of its exclusive dealing policy. More specifically, Champion claims that neither the instructions nor the special interrogatories fairly informed the jury of the requirement that the anticompetitive effect of this policy, if any, be evaluated within the relevant market, and that the resultant absence of findings in

this regard invalidates the verdict. In this connection, Champion argues that the court's charge on the issue of the reasonableness of the challenged restraint, when juxtaposed with Special Interrogatory No. 1, erroneously submitted the case to the jury on a "per se" illegality theory. Finally, defendant objects to the court's refusal to instruct on the distinction between mere advocacy of single line selling and coercion, and its right to cancel the distributorship agreement on the basis of Hornsby's filing of false sales reports.[5]

### A. Rule of Reason and the Relevant Market

Section 1 of the Sherman Act, which literally proscribes "[e]very contract, combination ..., or conspiracy in restraint of trade," has been judicially tempered to dictate the application of a "rule of reason" analysis to all but a narrow category of business practices adjudged per se violative of the Act. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

Answer: $4,669.45

**5.** By tendering instructions and special interrogatories on the issues raised on appeal, and by objecting to the court's proposed charge and interrogatories before the jury retired, Champion properly reserved its claims of error. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1254, 75 L.Ed.2d 483 (1983). Our review of defendant's challenge to the adequacy of the interrogatories is governed by the following standards:

> ... whether, when read as a whole and in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury, ... whether the submission of the issue to the jury was "fair," ... and ... whether the "... questions of fact" were clearly submitted to the jury.

*Dreiling v. General Electric Co.,* 511 F.2d 768, 774 (5th Cir.1975) (citations omitted). *Accord, Chemetron Corp.; Central Progressive Bank v. Fireman's Fund Insurance Co.,* 658 F.2d 377 (5th Cir.1981). As we observed in *Miley v. Oppenheimer & Co. Inc.,* 637 F.2d 318 (5th Cir.1981):

> ... there is no basis for [the appellant's] apparent assumption that because an issue is important to the outcome of the case, the

jury must be instructed to supply a specific answer informing the court how they resolved that one issue. No party is entitled to a special verdict on each of the multi-faceted, multitudinous issues essential to the resolution of a given case.

*Id.* at 334.

A similar standard controls our review of the jury instructions:

> "[T]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." Our jurisprudence mandates that we consider the charge as a whole, viewing it in the light of the allegations of the complaint, the evidence, and the arguments of counsel.

*Smith v. Borg-Warner Corp.,* 626 F.2d 384, 386 (5th Cir.1980) (citations omitted) (*quoting from Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). *See Farace v. Independent Fire Insurance Co.,* 699 F.2d 204 (5th Cir.1983); *Robert v. Conti Carriers & Terminals, Inc.,* 692 F.2d 22 (5th Cir.1982); *Chemetron Corp.* The court is not obliged to adopt the precise language and form urged by the parties. *Coughlin v. Capitol Cement Co.,* 571 F.2d 290 (5th Cir.1978).

Vertical non-price restraints are tested by the rule of reason. *Continental T.V.; Multiplex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980 (5th Cir.1983); *Mendelovitz v. Adolph Coors Co.,* 693 F.2d 570 (5th Cir.1982). Since the agreement to abide by an exclusivity policy originated with the defendant manufacturer, and was purportedly imposed on entities operating at a different level of distribution, this agreement is vertical in character. *See Mendelovitz; Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786 (5th Cir.1982); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). We must therefore assess the legality of the restraint complained of under the guidon of the rule of reason.[6]

▪ The rule of reason inquiry focuses on the competitive significance of a particular restraint, to be measured by reference to "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed," as well as the actual impact of this restraint on competition. *National Society of Professional Engineers,* 435 U.S. at 692, 98 S.Ct. at 1365. *See Continental T.V., Inc.*[7] Under the rule, the anticompetitive evils of a restrictive practice must be balanced against any procompetitive benefits or justifications within the confines of the relevant market. *See Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564 (5th Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason. *Mendelovitz; Sports Center; Muenster Butane; Dougherty v. Continental Oil Co.,* 579 F.2d 954 (5th Cir.1978), *judgment vacated by stipulation,* 591 F.2d 1206 (5th Cir.1979). *See also Associated Radio Serv. Co. v. Page Airways,*

---

**6.** Exclusive dealing arrangements have not received the more stringent per se treatment. *Bravman v. Bassett Furniture Indus., Inc.,* 552 F.2d 90 (3d Cir.1977), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1978) (exclusive dealing requirement to be examined under rule of reason). According to one commentator:

> There are many "normal and usual agreements in aid of trade and commerce," ... which involve the acceptance by the parties of limitations on their freedom individually to deal with others.... Requirements contracts, exclusive dealing contracts and contracts involving exclusive territories all involve limitations on the freedom of one or more of the parties to do business with others....
>
> Because all of these situations involve an agreement between two or more persons under which one or more of them agree not to deal with other persons and for that reason foreclose a part of the market to such third persons, they're all subject to scrutiny under the anti trust laws. But in the ordinary case these do not involve combining for the primary purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect. The issue in these cases is not the existence or nonexistence of concerted refusal to deal, but rather whether the purpose and effect of the operation of the contract, association, exchange or joint sales agency was such as

unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce—is not here applicable.

Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847, 876–77 (1955).

**7.** Mr. Justice Brandeis articulated the now-classic formulation of the rule of reason in *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918):

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244.

*Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); II E. Kintner, Federal Antitrust Law, § 16.4 (1980).[8]

Market considerations thus provide the "objective benchmarks" for ascertaining the existence of a section 1 violation. *Continental T.V.,* 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21. *See Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co.,* 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934). Relevant market is defined in terms of product differentiation and geographical boundaries. As we opined in *Dougherty,* "[t]he relevant product market is composed of products that have reasonable interchangeability for the purposes for which they were produced—price, use and qualities considered." 579 F.2d at 963 n. 4. *See United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (section 2 case).[9] The outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes (cross-elasticity of demand), and the ability of other existing producers or new entrants to expand output from their present facilities or to build new capacity (elasticity of supply). *See Spectrofuge Corp. v. Beckman Instruments, Inc.,* 575 F.2d 256 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Kaplan v. Burroughs Corp.,* 611 F.2d 286 (9th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). *See generally* II P. Areeda & D. Turner, Antitrust Law ¶¶ 525 & 526 (1978). Within a broad product market, economically significant submarkets may exist which in themselves constitute product markets. *Brown Shoe Co. v. United States,* 370 U.S.

294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). In determining the limits of a submarket, the trier of fact may

> ... examin[e] such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized venders.

*Brown Shoe,* 370 U.S. at 325, 82 S.Ct. at 1524 (footnote omitted). *See also Associated Radio Serv. Co.,* 624 F.2d at 1349 & n. 12 (citing with approval district court's instruction on relevant market for purposes of section 1 and section 2 claims which incorporated *Brown* factors); 2 von Kalinowski, Antitrust Laws and Trade Regulation, § 8.02[2] (1982).

The geographic dimension of the relevant market encompasses " 'the area of effective competition' " in which the particular product or its reasonably interchangeable substitutes are traded. *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 988 (D.C. Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (*quoting from Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 321, 328, 81 S.Ct. 623, 625, 628, 5 L.Ed.2d 580 (1961)). *Accord,* L. Sullivan, Handbook of the Law of Antitrust § 19 (1977). Areeda and Turner point out that the geographic market is a measure of the capacity of competing firms to sell beyond their immediate location, and "determines whether a particular product market is national, regional or even narrower." II P. Areeda & D. Turner, 522 at 355.[10] Several

---

**8.** We have declared repeatedly that " '[t]he first step in establishing an unreasonable restraint of trade is to show anti-competitive effect' " in the relevant market. *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir. 1979) (*quoting from H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir.1978). *See generally* Zelek, Stern and Dunfee, A Rule of Reason Decision Model After Sylvania, 68 Calif.L.Rev. 13, 31 (1980).

**9.** Basic principles governing definition of the relevant product and geographic markets in section 2 cases may be applied in actions arising under section 1 of the Sherman Act, and section 7 of the Clayton Act, 15 U.S.C. § 18. *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 292 (9th Cir.1979), *cert. denied* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980).

**10.** Sullivan offers the following explanation of this concept:

discrete submarkets may be integrated within a larger geographic market. *Kaplan v. Burroughs Corp. See Brown Shoe Co.; United States v. Dairymen, Inc.,* 660 F.2d 192 (6th Cir.1981); *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275 (8th Cir.1981). Whether ascertaining the scope of a geographic market or submarket, however, such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered.

### B. *Anticompetitive Effect*

 Not only must the plaintiff establish the parameters of the relevant market, it must also prove that the defendant's conduct adversely affected competition within that market. After *Continental T.V.,* the courts must balance the competitive repercussions of a vertical restraint on the intrabrand and interbrand components of the relevant market.[11] A reduction in intrabrand competition will not suffice to demonstrate the requisite market impact, so long as interbrand competition continues to function as a "significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Continental T.V., Inc.,* 433 U.S. at 53 n. 19, 97 S.Ct. at 2558 n. 19. *See Mendelovitz; Muenster; Red Diamond Supply, Inc.;*

> If sellers within the area are making price and output decisions protected from the need to take account of sellers outside the area, there· is a distinct [geographic] market. If sellers within the market must take account of sellers outside it, either because those sellers are mobile and can easily come into the area to sell, or because buyers are mobile and can easily go outside the area to buy, the market is being defined too narrowly.

L. Sullivan, Handbook of The Law of Antitrust, § 19 at 68.

11. In *Continental T.V., Inc.,* the Supreme Court furnished this definition of the interbrand and intrabrand sectors of the relevant market:

> Interbrand competition is the competition among manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law.... In contrast, intrabrand competition is the competition between distributors—wholesale or retail—of the product of a particular manufacturer.

*Aladdin Oil Co. v. Texaco,* 603 F.2d 1107 (5th Cir.1979). *But see* von Kalinowski, § 6E.05[02][a]. Reasoning that while a manufacturer's territorial allocation plan might suppress competition among dealers of the same product within a specific locale, and that might also serve to stimulate competition among different manufacturers of comparable products, the Supreme Court upheld a manufacturer's termination of the plaintiff's distributorship based on its refusal to adhere to this plan. 433 U.S. at 56–58, 97 S.Ct. at 2560–2561. Absent proof of a diminution in interbrand market power, therefore, a manufacturer's termination of a single distributor does not contravene the antitrust laws. *See e.g., Muenster Butane, Inc.; Red Diamond Supply, Inc.; Aladdin Oil Co.; Daniels.*

### C. *The Case at Bar*

 Applying these principles to the present case, we conclude that the trial judge erroneously failed to instruct the jury that any foreclosure of competition must be evaluated in the context of the product and geographic markets affected. Albeit charged on plaintiff's theory of market definition with respect to the section 2 claim, the jury was given no guidance in assessing the operation of the challenged restraint "in relationship to a clearly defined market." *Dougherty,* 579 F.2d at 963.[12] Even assum-

433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

12. The court's charge on Hornsby's section 1 claim is excerpted in pertinent part:

> The general objectives of the federal antitrust laws are to preserve and advance our system of free and open competition, and to secure to everyone an equal opportunity to engage in the business, trade, and commerce of this country. This policy is a primary feature of our private enterprise system.
>
> In this case plaintiff, Hornsby Oil Company, Inc., seeks money damages alleging two antitrust claims against defendant Champion Spark Plug Company, Inc. The first claim is made under a part of the federal antitrust laws known as Section 1 of the Sherman Act. The second claim relates to Section 2 of the Sherman Act. After instructing you on the law governing Section 1 of the Sherman Act, I will instruct you on the law as it pertains to Section 2 of the Act.

ing the court could have reserved the right to formulate the necessary market findings,

despite Champion's request for submission of the question of market definition to the

*Section 1 of the Sherman Act.* This law provides, in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States is declared illegal."

The specific conduct which plaintiff claims violated Section 1 of the Sherman Act is an alleged conspiracy between defendant and plaintiff relating to the direct account distribution of automotive replacement spark plugs. Plaintiff alleges that the conspiracy between the plaintiff and the defendant required plaintiff, as a condition to becoming a direct account distributor for Champion, and as a continuing condition to remaining a direct account distributor for defendant, to cease dealing in competitive lines of spark plugs. Plaintiff further alleges that plaintiff and the defendant entered into a combination or conspiracy which restricted plaintiff's distribution of Champion spark plugs to a territorial area which did not include Houston, Harris County, Texas. In connection with these allegations plaintiff claims that defendant wrongfully terminated plaintiff's Champion distributorship contract because plaintiff failed to abide by the alleged conspiracy to cease dealing in competitive lines of spark plugs.

Defendant denies it entered into any combination or conspiracy to require plaintiff to distribute defendant's products exclusively or which restricted plaintiff's sales territory. Defendant claims that it properly terminated plaintiff's distribution contract, unilaterally, for the reason that plaintiff falsely reported its sales to Champion.

There are four essential elements which the plaintiff must prove by a preponderance of the evidence in order to establish its claim under Section 1 of the Sherman Act, as follows:

First: That there was a contract, combination or conspiracy between the defendant and plaintiff, as alleged by plaintiff;

Second: That such contract, combination or conspiracy constituted an "unreasonable" restraint of interstate commerce as hereafter defined;

Third: That such contract, combination or conspiracy constituted a restraint of interstate commerce involving a not insubstantial amount of such commerce; and

Fourth: That the plaintiff suffered injury in its business or property as a proximate result of the alleged contract, combination or conspiracy.

\* \* \* \* \* \*

The second element which the plaintiff must prove in order to establish its conspiracy claim is that the alleged conspiracy re-

sulted in an "unreasonable" restraint of interstate commerce.

The requirement that the restraint of trade be unreasonable is referred to as the "Rule of Reason" test of illegality. You are instructed therefore that "restraint of trade" as used in Section 1 of the Sherman Act applies only to unreasonable restraints and not to all possible restraints of trade. The antitrust laws seek to maintain free competition in interstate commerce in order to protect the public interest. The end sought by the antitrust laws is the prevention of unreasonable restraints in business and commercial transactions which tend to restrict production, raise prices, or otherwise control or affect the market to the detriment of purchasers or consumers of goods and services; the public is to be protected in order to secure to them the advantages which accrue to them from free competition in the market. Not all restraints of trade are unreasonable restraints. All business affects trade in some way. Therefore, in determining whether a "restraint of trade" exists, you must decide whether the conduct which you have found tends to restrict or otherwise control free and open *competition.* And in determining whether or not such an unreasonable restraint exists, you need not find a specific injury, but you must find that the conduct tends to or is reasonably calculated to prejudice the public interest.

The question of whether or not an alleged conspiracy constitutes an "unreasonable" restraint of interstate commerce must also be determined on the basis of full consideration of all of the facts and circumstances disclosed by the evidence including the nature of the particular industry or the product involved; the market area involved; any facts which you find to be peculiar to that industry, product, or market area; the nature of the alleged restraint and its effect, actual and probable; the history of the circumstances surrounding the alleged restraint and the reasons for adopting the particular practice which is alleged to constitute the restraint. The law does not define which restraints are reasonable and which are not. It is for you to decide whether the evidence in this case shows an unreasonable restraint, and the plaintiff may not recover unless you find an unreasonable restraint by a preponderance of the evidence, as defined in these instructions.

\* \* \* \* \* \*

The fourth element which plaintiff must establish as a part of its claim is that it suffered injury in its business or property as a proximate result of the alleged contract, combination, or conspiracy. It frequently occurs in the course of normal, lawful competi-

jury, Fed.R.Civ.P. 49(a), it should have informed the jurors of these findings in order to afford them a legal predicate for their deliberations on submitted issues.

Under these circumstances, the court's charge on the reasonableness of the vertical restraint, *see* footnote 12, *supra*, a composite of a portion of the Fifth Circuit's Pattern Jury Instructions [13] and an instruction approved in *Associated Radio Serv., Inc.,* 624 F.2d at 1353 n. 20, did not overcome the prejudice inherent in its failure to give an instruction on the market definition process. In *Associated Radio Serv., Inc.,* we deemed sufficient a similar "reasonableness" instruction only when viewed against the background of a general charge which included a detailed instruction on the relevant product and geographic markets. Given the absence herein of any assistance to the jury in gauging the anticompetitive effect of the restraint within the relevant market, and the axiom that a manufacturer may legally cancel a distributorship unless this action exerts such an effect, the general explanation of the concept of reasonableness set forth in the charge was insufficient. Where another trial court had failed both to draw the critical distinction between a legal and illegal termination in a distributorship case, and to define the relevant market, we noted:

> The trial judge instructed the jury on none of ... [such] explicit indicia of unreasonableness [as attempt to monopolize, price fixing, resale price maintenance or territorial allocation]. Rather the jury was told that unreasonable restraints were "commercial transactions which tend to restrict production, raise prices, or otherwise control the market to the detriment of purchasers or consumers of goods and services...." This standard insufficiently distinguishes unreasonable restraints from reasonable ones. The rule of reason, while it permits a broad-ranging inquiry into the effect of trade restraints, requires more than simple proof of restraints. Unless the jury is given an analytical framework for judging the anti-competitive intent and effect of trade restraints, the rule of reason becomes nothing more than a rule of evidence permitting the plaintiff to raise an inference of unreasonableness from the mere proof of restraints.

*Dougherty,* 579 F.2d at 961 n. 3.

Special Interrogatory No. 1 only compounded the error attributable to the omission of a relevant market instruction. *See* footnote 4, *supra.* This interrogatory could be construed as advising the jury that if Hornsby succeeded in proving the existence of an exclusive dealing conspiracy between itself and Champion, this arrangement would presumptively constitute an unreasonable restraint of commerce. In other words, the jury could, in light of the otherwise defective charge, have simply determined that an exclusive dealing agreement had been formed and, in so doing, have found Champion automatically guilty of having unreasonably restrained competition.

■ Champion's proposed instruction on its false reporting defense was rejected by the magistrate. Aside from a one-line allusion to this defense, the charge was silent

---

tion that some businesses may suffer severe economic losses. It is only when such economic losses are caused by unlawful competitive practices that the antitrust laws are violated. An injury to a business can be said to be the "proximate result" of an antitrust violation only when the act or transaction constituting the violation directly and in natural and continuous sequence produces, or contributes substantially to producing, such injury. In other words, the alleged violation or violations of the Sherman Act by the defendant must be a direct, substantial and identifiable cause of the injury which plaintiff claims to have sustained.

In this case, plaintiff Hornsby Oil Company, Inc., also claims that defendant Champion Spark Plug Company, Inc. violated Section 2 of the Sherman Act.

*Section 2 of the Sherman Act.* This law provides, in pertinent part:

> "Every person who shall monopolize, or attempt to monopolize, ... any part of the trade or commerce shall be ... guilty of a ... [violation of the antitrust laws.]"

**13.** *See* Pattern Jury Instructions (Civil Cases) at 27 (1980), prepared by the Committee on Pattern Jury Instructions of the District Judges Association of the Fifth Circuit.

with regard to the manufacturer's prerogative to refuse to deal with a customer for business reasons independent of the conspiracy. There was ample evidence that Ms. Hornsby's falsification of monthly sales reports afforded a legitimate ground for termination of its distributorship. A fact issue having thus been raised, defendant was entitled to the submission of an appropriate instruction on its theory of defense. *See Coughlin v. Capitol Cement Co.,* 571 F.2d 290 (5th Cir.1978). The magistrate erred in declining to so charge.

 By the same token, we do not regard as erroneous the magistrate's refusal to instruct the jury on the lawfulness of Champion's promotion of single-line selling. Borrowing from Clayton Act jurisprudence, 15 U.S.C. § 14, a proscribed exclusionary agreement is established if the buyer is not free to deal in competitive goods. *Dillon Materials Handling, Inc. v. Albion Indus.,* 567 F.2d 1299, 1302 (5th Cir.1978) (a § 3 complainant must prove (1) that "its purchases as a distributor were made 'on the condition, agreement, or understanding' that it would not sell" competing goods, and (2) a substantial lessening of competition). Considered as a whole, the charge fairly allows the jury to distinguish permissible "hard sell" tactics from the unlawful preclusion of Hornsby's ability to purchase from competing sellers.

For these reasons, we reverse and remand for retrial on Hornsby's section 1 claim. Because of this disposition we do not address Champion's challenge to the sufficiency of plaintiff's evidence on the various elements of this claim.

### Hornsby's Cross-Appeal

Since the existence of an illegal exclusivity policy has not been established, we do not reach Hornsby's contention that the illegality of the distributorship contract relieves it of any obligation to reimburse Champion for merchandise procured in February 1976. We do conclude, however, that Fed.R.Civ.P. 41(b) does not bar Champion from relitigating its common law counterclaim because of a Texas court's dismissal of Hornsby's prior state court action against Champion for want of prosecution. In that action Champion counterclaimed. Hornsby argues that because the state ruling is silent as to the nature of the dismissal, it perforce operates as a judgment on the merits, thereby pretermitting, on res judicata grounds, Champion's assertion of a federal counterclaim which is patterned on an identical counterclaim filed in the state action.

A federal court sitting as the trial judge did here must accord a state court dismissal the same effect as would the state courts. *See Angel v. Bullington,* 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947). Inasmuch as the Texas courts do not treat a dismissal for failure to prosecute as an adjudication on the merits, *see Gracey v. West,* 422 S.W.2d 913 (Tex.1968), we decline to do so in this instance. Hence no *res judicata* effect attaches to the state court dismissal.

REVERSED and REMANDED for further proceedings consistent with this opinion.