**R.D. IMPORTS RYNO INDUSTRIES, INC., d/b/a R.D. Ryno Mazda, Plaintiff-Appellee,**

v.

**MAZDA DISTRIBUTORS (GULF), INC., and Mazda Motors of America (Central), Inc., Defendants-Appellants.**

No. 86–1087.

United States Court of Appeals, Fifth Circuit.

Jan. 14, 1987.

Charles T. Newton, Jr., Richard D. Milvenan, Robert C. Walters, Houston, Tex., Ky P. Ewing, Jr., Washington, D.C., for defendants-appellants.

Catherine Griffith O'Sullivan, Washington, D.C., for amicus–USA.

B. Thomas McElroy, Dan McElroy, Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, DAVIS, and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

Defendants appeal from an adverse jury verdict on federal antitrust and Dealers' Day in Court Act claims. Because we believe the district court erred in failing to grant defendants' motion for judgment notwithstanding the verdict, we reverse the judgment of the district court.

### Background

R.D. Ryno Industries, Inc., d/b/a R.D. Ryno Mazda ("Ryno"), operated a Mazda automobile dealership in Fort Worth, Texas

from 1971 until 1982. Ryno purchased its inventory of Mazdas from Mazda Distributors (Gulf) Inc. ("Gulf"), which received vehicles from the national distributor, Mazda Motors of America (Central), Inc. ("Central"). Gulf sells vehicles to 171 dealers in 11 states.

When Ryno first began operating the dealership in 1971, Mazda's vehicles were not particularly popular. Problems with Mazda's unique rotary engine in the mid–1970s reduced Mazda sales. In the late 1970s, however, the coincidence of two events caused fortune to shine on Mazda— the introduction of an inexpensive, reliable and fuel-efficient vehicle (the GLC) and the oil crunch resulting from the Arab oil embargo. The low price and fuel efficiency of the GLC caused it to be one of Mazda's most popular models.

Mazda's success continued with the introduction of the RX–7 sports car and the 626 sedan. Mazda also began offering a line of small trucks. The relatively low price and good performance of these vehicles resulted in a high volume of sales. The sporty RX–7 met with especially high demand. The rising price of gasoline at the pump only increased the popularity of Mazda vehicles. The popularity of the 626 and RX–7 led to the virtual disappearance of discounts below the sticker price of the vehicles. Indeed, consumers were willing to pay substantial premiums over the manufacturer's suggested retail price.

By 1979, the demand for Mazda vehicles outstripped the supply. In response, Ryno's distributor, Gulf, adopted an allocation system for all new Mazdas. Gulf allocated the cars it purchased from Central on the basis of an individual dealer's sales over a rolling three month period. For example, if a Gulf dealer sold 5% of the cars sold by all of Gulf's dealers over a three month period (January, February and March), the dealer would receive 5% of Gulf's cars for the month of April. The allocation for May would then be based on the dealer's sales for February, March and April. In other words, the allocation system was fractional, with the denominator being the total number of cars sold by all of Gulf's dealers and the numerator being the number of cars sold by one of Gulf's dealers over a three month period. The fraction represented the share of cars a dealer would be entitled to receive.

Gulf measured a dealer's sales by counting the number of retail delivery receipts or "RDRs" that it received from each dealer. The submission of these cards was critical to a dealer's success for, in determining a dealer's total sales, Gulf would count RDRs received. Thus, a dealer who sold cars without submitting RDRs would not have those cars counted in determining his allocation.

Gulf did not allocate the cars on a model-by-model basis. Thus, a dealer who sold a particularly large number of RX–7s would not receive a proportionately larger allocation of RX–7s. Total sales determined a dealer's fractional share of Gulf's total allocation. If a dealer wanted more RX–7s or 626s, he would need to sell more of all the cars he received, not merely those particular models.

Although Ryno sold practically every Mazda it received, the dealership quickly became dissatisfied with Gulf's allocation system. Ryno saw its closest competitor, Bailey Mazda, receiving much larger allocations of Mazda vehicles. Although Bailey had a larger dealership and sold more cars than Ryno and was thus entitled to a larger allocation, Ryno perceived the system as an attempt to drive its dealership out of business. According to witnesses for Ryno, it was not one of Gulf's "favored" dealers. More specifically, Ryno alleged that Gulf was attempting to drive it out of business because it was a dual import dealer—it sold Mazdas and another imported line of car, Fiat. Gulf had a plan, according to Ryno, to create dual domestic dealerships that sold Mazda and a domestic line of cars like Chrysler or Ford. Ryno believed its theory confirmed when the individual who purchased the dealership in 1982 quickly dropped the Fiat line and began selling Mazdas and General Motors cars.

Ryno filed suit against Gulf, Central and the Japanese manufacturer of Mazda vehicles, alleging violations of the federal antitrust laws and the Dealers' Day in Court Act ("DDICA"). Ryno attacked the allocation system as a tying arrangement and an unreasonable restraint of trade under section 1 of the Sherman Act, and a coercive practice under the DDICA. Ryno based its damage theory on the profits it could have made in the operation and sale of the dealership in the absence of Gulf's injurious allocation system.

The jury returned a verdict for Ryno on the unreasonable restraint of trade claim and the DDICA claim. The district court entered a judgment of almost two million dollars on the former claim and over a quarter of a million dollars on the latter. Defendant-appellants Central and Gulf appeal the denial of their motion for judgment notwithstanding the verdict.

Section 1 of the Sherman Act

■ Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. 1. Although its literal terms apply to prohibit every restraint of trade, the Supreme Court has long interpreted the statute to prohibit only those restraints of trade that unreasonably restrain competition. *Standard Oil, Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *National Society of Prof. Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Thus, the elements of a section 1 violation are threefold: 1) joint or concerted action between more than one party that 2) unreasonably restrains trade in 3) interstate or foreign commerce.

The district court submitted instructions and interrogatories to the jury that properly reflected these requirements. The jury found that Gulf had combined with Central and with dealers to unreasonably restrain

trade and that such restraint proximately caused damage to Ryno. We review the jury's findings under the now familiar standard of *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). We must view the evidence in the light most favorable to Ryno and, if the record contains evidence "of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions," the verdict must stand. *Id.* In the present case, we discern no evidence in the record upon which a reasonable juror could base a finding that the Gulf allocation system unreasonably restrained trade.

The crux of an analysis of any alleged restraint of trade is the impact of that restraint on competition.[1] *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir.1981). Simply put, the issue is whether the restraint is "one that promotes competition or one that suppresses competition." *National Society*, 435 U.S. at 691, 98 S.Ct. at 1365. To be unreasonable and thus illegal, the restraint's impact on competition must be "substantially adverse." *United States v. Arnold, Schwinn, and Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 1863, 18 L.Ed.2d 1249 (1967).

Market considerations provide the objective benchmark for the measurement of competitive impact. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54, 97 S.Ct. 2549, 2559, 53 L.Ed.2d 568 (1977); *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111, 113 (5th Cir.1979). There can thus be no rational ascertainment of competitive injury without first defining the relevant market. As this court has noted, "the relevant market is defined in terms of product differentiation and geographical boundaries." *Hornsby Oil Co., Inc. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir.1983). Market definition, then, has two relevant dimensions—characterization of the product itself and charac-

---

1. We believe that the plaintiff's failure to establish any competitive injury is the most salient issue in this case. Our analysis assumes suffi-

cient evidence in the record to support the jury's finding of joint or concerted action.

terization of the relevant geographic market in which that product is sold.

The antitrust plaintiff is required to define the relevant product market in terms of goods that are "reasonably interchangeable" with the goods at issue. *Id.* at 1393; *see also Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 319 (5th Cir.1985). Goods that consumers view as substitutes for other goods can be said to be in competition with each other. The record reflects that each of the vehicles in the Mazda line (the GLC, 626, RX–7 and B–2000 truck) had a variety of substitutes, both foreign and domestic. The GLC, for example, apparently competed with other small, fuel efficient models like the Toyota Corolla and the Chevrolet Chevette.

As this court noted in *Hornsby,* "the geographic dimensions of the market encompasses the areas of effective competition in which the particular product or its reasonably interchangeable substitutes are traded." *Hornsby,* 714 F.2d at 1393. Ryno introduced evidence that Tarrant County constituted the relevant market for the sale of Mazda automobiles.

Once the market is defined, the inquiry focuses on the alleged injurious practice and its impact on competition in the market. The restraint in the instant case is a vertical one (that is, it operates between entities at different levels in the chain of distribution) and a reduction in intrabrand competition will not suffice to demonstrate the requisite competitive injury. *Id.* at 1394. In other words, a showing that Gulf's allocation system somehow reduced competition in the sale of Mazda vehicles will not suffice. A reduction in intrabrand competition is unimportant so long as interbrand competition operates as a "significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Sylvania,* 433 U.S. at 52, n. 19, 97 S.Ct. at 2558, n. 19. Thus, even if a practice resulted in reduced competition in Mazdas, such a practice would not be objectionable in section 1 terms if consumers could effectively choose Chevrolets or Toyotas.

Ryno's claim of injury completely ignores the impact of significant interbrand competition in Tarrant County. Given the presence, as indicated by the record, of a variety of domestic and foreign car dealerships in Tarrant County, Gulf's allocation system could not cause more than a ripple in the competitive pool. Each model of Mazda cars competed with other domestic and foreign cars in Tarrant County.

That significant interbrand competition existed in Tarrant County should surprise no one, especially given the evidence in the record of Mazda's minimal market share. Throughout the time period relevant to this litigation, Mazda sold less than 5% of all the cars sold in Tarrant County. Without a more significant market share, the Gulf allocation system could have no injurious effect on competition.[2] Without market power, a competitor can do nothing to diminish competition. *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 90 (5th Cir.1978), *cert. denied* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979).

Even in the face of minimal market power, Ryno asserts that the allocation system had several anticompetitive effects. First Ryno argues that the "misallocation" of Mazdas between his dealership and the closest competitor, Bailey Mazda, enabled Bailey to charge higher prices for the Mazdas he sold. The scenario is as follows: Ryno would receive fewer cars per month than Bailey and would thus run out of cars earlier each month. For the remaining

**2.** Ryno attempts to avoid the implications of this minimal market share by suggesting that Mazda's power should be measured in terms of the RX–7 and the 626. Although Mazda had a low market share overall, Ryno argues, it controlled the market in 626s and RX–7s. We reject this attempt to narrowly define the relevant market in terms of one or two products. *Seidenstein v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985). As our discussion on the relevant product market indicates, the record reflects that Mazda vehicles had a variety of domestic and foreign substitutes.

days in the month, Bailey could extract higher prices from the consumer.

Neither the record nor basic economic theory will support Ryno's claim. Bailey could not charge exorbitant prices for his cars because he faced the same competition that Ryno faced in Tarrant County. Simple economic logic dictates that if Bailey's prices rose too high, consumers would take their business to another Mazda dealership[3] or, indeed, to another domestic or foreign dealership.[4] Even without the help of this simple economic notion, the record will not support a claim that Bailey did, in fact, exact exorbitant prices for his vehicles.[5]

Ryno also proposes that the allocation system resulted in increased prices for domestic automobiles in Tarrant County. According to Ryno, the allocation system forced the dealership to take "unwanted" low profit margin GLCs in order to maintain high allocations of the more profitable 626s and RX–7s. Ryno then "dumped" these low priced GLCs on the market, thus reducing the sales of domestic cars. Domestic dealers responded to this reduction in sales by increasing the prices of their vehicles. Selling fewer cars required them to extract larger profits from each sale they made.

Reciting this novel damage theory reveals its inherent weakness. Increased competition in small, fuel efficient cars like the GLC should cause domestic dealers to lower their prices to prop up their own sagging demand. An increase in price would only cause the domestic dealers to sell even fewer cars. There is no credible

expert or lay testimony in the record to suggest that domestic dealers reacted in this rather unorthodox way to increased Mazda sales. To accept this position would require this court to accept a rather perverse view of the impact of competition on consumer prices. This we choose not to do.

The failure to show injurious market impact doomed the plaintiff in *H & B Equipment Co., Inc. v. International Harvester Co.*, 577 F.2d 239 (5th Cir.1978). In that case, International Harvester set up its own store in direct competition with one of its distributors. The distributor, H & B Equipment, sued under section 1 alleging an unreasonable restraint of trade. The court rejected this claim. "International Harvester's treatment of H & B ... had no adverse effect on competition.... Absent anticompetitive effect, an unlawful intent will not establish a rule of reason violation, nor will the use of unfair methods of competition." *Id.* at 246 (citations omitted). In the present case, even assuming that Gulf wrongfully sought to replace Ryno with a dual domestic dealership, the absence of any competitive injury renders Ryno's claim meritless. *See Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir.1985).

Considering all the facts and circumstances relevant to the Gulf allocation system, it is not surprising that Ryno cannot sustain a tenable claim of injury. No one disputes that Mazdas were in short supply. No one disputes the need for some type of allocation system. The system chosen by Gulf maximized the advantages of competi-

---

**3.** A Mazda dealership in Arlington, Texas provided competition for both Ryno and Bailey.

**4.** Without market power, Bailey's attempts to raise prices would be foolhardy. As the Seventh Circuit noted in *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, "[a] firm that has no market power is unlikely to adopt practices that disserve its consumers; it cannot afford to." 678 F.2d 742, 745 (7th Cir.1982).

**5.** Ryno's proposed solution to the allocation problem was an equal allocation of cars between the Bailey and Ryno dealerships. Instead of Ryno receiving 300 cars and Bailey 1500 cars (annually), each would receive 900. If this situ-

ation had existed, according to Ryno, the public would have benefitted by lower prices.

As a matter of economic logic, however, this does not necessarily follow. High prices on Mazda cars were a reflection of short supply and great demand. Reallocation does not create any more cars. A shortage of Mazdas would still exist and the high demand would continue to exert an upward pressure on prices. Neither dealer, even with an equal allocation of cars, would have any incentive to reduce prices. In a time of shortage, price increases, not reductions, will prevail.

tion between Mazda dealers. Dealers that sold more cars in a given month would receive increased allocations. Dealers that sold less would see their allocations decrease.

An aggressive dealer could find alternative ways to increase his allocation. For example, if a dealer ran low on a particular model like the RX-7, he could try to purchase the car from another Mazda dealer. So long as he received the RDR from the selling dealer [6], the car would count towards his total number of cars sold. This is in fact what Ryno did on many occasions, often paying a large premium over the sticker price for the car. Ryno never faced any difficulty reselling these cars to the consumer.

Despite the complaints about the allocation system, Ryno operated a profitable dealership. Ryno sold practically all the cars it received, turning an average gross profit of over $1,000 on the popular RX-7 and 626 models. When the dealership was sold in 1982, Ryno received a substantial ($500,000) "blue sky" payment for the dealership's goodwill. The root of the complaint is that Ryno could have sold more cars if given the chance. Unfortunately, a shortage of cars prevented Ryno from obtaining as many cars as desired. Although we applaud Ryno's healthy desire for increased success, section 1 of the Sherman Act cannot provide a guarantee of greater profits. It can only protect our competitive system from unreasonable restraints of trade. With no evidence of such a restraint in the record, the jury's verdict cannot stand.

Dealers' Day in Court Act

■ The jury returned a verdict for Ryno on his claim under the DDICA (15 U.S.C. §§ 1221–1225). On appeal, appellants argue that reasonable minds could

not find that Gulf made, under the charge of the court, a "wrongful demand which will result in sanctions if not complied with." [7] We agree with appellants that the record will not support a finding of the requisite "wrongful demand."

The DDICA "gives to an automobile dealer a federal cause of action against an automobile manufacturer who fails to act in good faith in performing or complying with any terms of the franchise agreement...." *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 514 (10th Cir.1976). As the court pointed out in *Cabriolet Porsche Audi v. American Honda Motor Co.*, 773 F.2d 1193 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986), "case law is clear that a manufacturer fails to act in good faith for purposes of recovery under [the DDICA] only if its conduct amounts to coercion or intimidation." *Id.* at 1210.

The record does not support the jury's finding of coercion. In support of the finding, Ryno argues that the allocation system forced him to buy cars from other Mazda dealers at inflated prices. Additionally, the system, "coerced" Ryno into buying unwanted GLCs and pickup trucks in order to receive high profit RX-7s and 626s.

Neither of these examples provides evidence of coercion. Gulf did not require Ryno to purchase cars; Ryno could decline any portion of its monthly allocation. Such a refusal would result in a decrease in subsequent allocation only if Ryno was unable to purchase cars from the vigorous secondary market (i.e., from other dealers). This was not coercion but simply a way for Ryno to increase his allocation.

In *Cabriolet*, the court confronted a similar claim of coercion. A Honda dealership could not keep up with the strong demand for Honda vehicles. The American distrib-

---

**6.** The record reflects that Ryno did not always obtain the RDR from the selling dealer. Only hard bargaining could motivate a dealer to part with the precious RDR. Although this practice may have made Ryno's task more difficult, it does not evince the type of competitive injury required by section 1.

**7.** Appellant Gulf also challenges the applicability of the DDICA to its operations. Gulf argues that it cannot be considered a manufacturer under the meaning of the DDICA. Ryno argues that Gulf was under the "control" of the Japanese manufacturer and thus covered by the DDICA. 15 U.S.C. 1221. For the purposes of our analysis, we assume that Gulf falls within the ambit of the DDICA.

utor, already engaged in allocating the short supply of Hondas, suggested a way that the dealer could receive increased allocations of vehicles—by becoming an exclusive Honda dealership and selling no other make of car. The court did not categorize this as coercion. "All American Honda did was suggest to Cabriolet a way to obtain extra cars—that is, more cars than Cabriolet was entitled to receive. This does not amount to coercion." *Id.* at 1210.

In the present case, Gulf merely suggested ways for Ryno to maintain or increase its allocation of cars. There is no evidence that Ryno received one car less than it was entitled to receive under the allocation system.

Nor can the GLCs or trucks be categorized as "unwanted." Ryno made money selling these models and the sales of these models benefitted Ryno's overall allocation. Ryno also benefitted from carrying the complete line of Mazda vehicles—this generated traffic in the showroom and increased the possibility of additional sales.

In the complete absence of any injury to competition and without a showing of coercion under the DDICA, we cannot sustain the judgment for Ryno. The judgment of the district court is therefore

REVERSED.