DOCTOR'S HOSPITAL OF
JEFFERSON, INC.

v.

SOUTHEAST MEDICAL ALLIANCE,
INC., and Jefferson Parish Hospital
Service District No. 2.

Civ. A. No. 93–2493.

United States District Court,
E.D. Louisiana.

April 19, 1995.

Gene W. Lafitte, Sr., Frank E. Massengale, Marie Breaux, Shannon Skelton Holtzman, Liskow & Lewis, New Orleans, LA, for Doctor's Hosp. of Jefferson, Inc.

Peter Joseph Butler, Donna DiMartino Fraiche, Aubrey B. Hirsch, Jr., Peter J. Butler, Jr., Richard G. Passler, Locke, Purnell, et al., Michael M. Meunier, Sullivan, Stolier & Daigle, Danielle Lombardo Trostorff, Lock, Purnell et al., New Orleans, LA, for Southeast Medical Alliance, Inc.

Harry Simms Hardin, III, Howard Earl Sinor, Jr., Katy Kimbell Theriot, Jones, Walker, et al., New Orleans, LA, Lucas Joseph Giordano, East Jefferson General Hospital, General Counsel, Metairie, LA, for Jefferson Parish Hosp. Service Dist. No. 2.

## ORDER AND REASONS

JONES, District Judge.

Pending before the Court are two motions for summary judgment, which were taken under submission on a previous date. The first is a motion for partial summary judgment by both defendants on plaintiff's federal and state antitrust claims. The second is a motion for partial summary judgment by defendant Jefferson Parish Hospital Service District No. 2 on the grounds that it is immune on the federal and state antitrust claims. Having reviewed the memoranda, the record and the applicable law, the Court GRANTS the first motion for partial summary judgment. As a result, the Court DENIES the second motion for partial summary judgment as MOOT.

### Background

Doctor's Hospital of Jefferson, Inc. ("Doctor's Hospital") filed this lawsuit against Southeast Medical Alliance, Inc. (hereinafter "SMA") and Jefferson Parish Hospital Service District No. 2, more commonly known as East Jefferson Hospital. Doctor's Hospital alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;[1] Louisi-

---

1. Section 1 of Title 15, U.S.C., states, in pertinent part:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

    Section 2 states, in pertinent part:

ana antitrust laws;[2] and the Louisiana Unfair Trade Practices and Consumer Protection Act.[3] Doctor's Hospital also alleged several other state-law based claims, including civil conspiracy, tortious interference with business relations and breach of contract. Doctor's Hospital brings this suit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.[4]

The basis for the lawsuit was the termination of plaintiff's participation in SMA, a preferred provider organization, which comprises a network of healthcare providers, both physicians and hospitals, who provide medical services at a discounted rate to subscribers of the plan.[5] SMA is owned by its providers and is a non-profit corporation. Doctor's Hospital was a founding member of SMA in 1988. East Jefferson was not.

A hospital can belong to SMA in one of two ways. First, a hospital can be a member hospital, as Doctor's Hospital was at SMA's founding. Second, a hospital can belong to SMA as a "participating hospital," whereby the hospital contracts with SMA and offers its services at a discount. In addition to offering discount services, "member hospitals" have an ownership interest and, as a result, a management interest in SMA. Representatives of each member hospital, *i.e.*, a hospital's administrator/chief executive officer and a designated hospital staff physician, serve as board members of SMA.

Although Doctor's Hospital was a founding member of SMA, it withdrew as a member hospital in 1990, later signing a contract with SMA in 1991 to be a participating hospital. (Exh. 6, R.Doc. 247.)

In 1992 discussions apparently commenced between SMA and East Jefferson for East Jefferson to join SMA. In November 1992 East Jefferson became a participating SMA hospital (Exh. 8, R.Doc. 247.), and in March 1993 East Jefferson became a member hospital upon vote of the SMA board. (Exh. 11, R.Doc. 247.) At the same board meeting, SMA voted to terminate Doctor's Hospital as a participating hospital.

The "participating hospital" contract between SMA and Doctor's Hospital provided that it "may be terminated by either party in its sole discretion by written notice to the other party given at least ninety (90) days in advance of such termination, or upon such other notice as the parties may mutually agree." (Section 4.2, Exh. 6, R.Doc. 247.) By letter in May 1993 SMA notified Doctor's Hospital that it was terminating its contract with Doctor's Hospital pursuant to the above-quoted term of the "participating hospital" contract. (Exh. 12, R.Doc. 247.)

This lawsuit followed on the heels of the termination.

Both defendants move for summary judgment on the basis that Doctor's Hospital has no standing to proceed on the antitrust claims because it cannot prove that there has been an "antitrust injury."[6] In opposition, Doctor's Hospital contends that not only has it shown "antitrust injury" but also that the defendants' actions were *per se* illegal under antitrust law.

### Law and Application

### I. Summary Judgment

In *Little v. Liquid Air Corporation,* 37 F.3d 1069 (5th Cir.1994) (*en banc*) the court

---

2. LSA–R.S. 51:122 *et seq.*

3. LSA–R.S. 51:1401 *et seq.*

4. Section 4 of the Clayton Act provides, in pertinent part:
   "Any person who shall be injured by his business or property by reason of anything forbidden in the antitrust laws may sue therefore...." Successful plaintiffs can recover triple damages. *Id.*

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

Section 16 provides states, in pertinent part: "Any person, firm or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." Successful plaintiffs suing under this provision can also recover attorneys' fees.

5. The subscribers are not typically patients but, for example, employers supplying health care coverage for their employees.

6. As noted, East Jefferson also moves for summary judgment on the basis of immunity from state and federal antitrust claims. The Court addresses this motion in Section VI, *infra.*

of appeals addressed the standard by which a motion for summary judgment is judged, analyzing and summarizing the recent teachings of the Supreme Court and the Fifth Circuit.

The Supreme Court has instructed us that the purpose of Rule 56 is to "enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." To be certain, Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

&ast; &ast; &ast; &ast; &ast; &ast;

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not *negate* the elements of the nonmovant's case. If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.

This burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmovant could or would prove the necessary facts.* Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case where "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." If the nonmoving party fails to meet this burden, the motion for summary judgment should be granted.

*Id.* at 1075–76 (citations omitted) (emphasis is original.)

Bearing these principles in mind, the Court turns to the law and issues before it.

## II. General Antitrust Principles

■ While a plaintiff may seek either damages or injunctive relief for antitrust violations, 15 U.S.C. §§ 15, 26, a private plaintiff must prove that it has suffered or will suffer an "antitrust injury." *Anago, Inc. v. Tecnol Medical Products, Inc.*, 976 F.2d 248, 249 (5th Cir.1992), citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986). An "antitrust injury" is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 109, 107 S.Ct. at 489, quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Whether a party sues under Section 4 or 16 of the Clayton Act, he or she must allege and show antitrust injury. *Cargill*, 479 U.S. at 113, 107 S.Ct. at 491.

As the Supreme Court stated in *Brunswick*, "[t]he injury should reflect the anticompetitive effect of either the violation or of the anticompetitive acts made possible by the violation." *Id.* "Typical anticompetitive effects include increased prices and decreased output." *Anago*, 976 F.2d at 249. The Fifth Circuit has "narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition." *Id.*

Ordinarily, antitrust violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, are proven under the rule of reason analysis. *See Business Electronics v. Sharp Electronics,* 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988). Under that analysis the factfinder weighs the facts and circumstances of each case and decides whether a certain restrictive practice should be proscribed as an unreasonable restraint on competition. *Id.*

■ The focus in the rule of reason analysis is on the competitive significance of a

particular restraint, measured against the facts peculiar to the business, "the history of the restraint, reasons for the restraint's imposition and the actual impact on competition." *Hornsby Oil Company, Inc. v. Champion Spark Plug Company, Inc.,* 714 F.2d 1384, 1392 (5th Cir.1983).

> Under the rule, the anticompetitive evils of a restrictive practice must be balanced against any procompetitive benefits or justifications within the confines of the relevant market. Proof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason.

> *Id.*

■ The relevant market is defined by looking to product differentiation and geographical boundaries. *Id.* In terms of products, "[t]he relevant product market is composed of products that have reasonable interchangeability for the purposes for which they were produced—price, use and qualities considered." *Dougherty v. Continental Oil Co.,* 579 F.2d 954, 963, n. 4 (5th Cir.1979), cited in *Hornsby Oil.* In terms of geographics, "the geographic dimension of the relevant market encompasses" the effective area of competition in which the product is traded. *Hornsby Oil,* 714 F.2d at 1393.

■ Antitrust law recognizes an exception to the rule of reason analysis. "Certain categories of agreements ... have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." *Sharp Electronics,* 485 U.S. at 723, 108 S.Ct. at 1519. However, "*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive.'" *Id.,* quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Further, the Supreme Court has "been slow .... to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445 (1986).

The advantage to a plaintiff when a violation is construed to be *per se* illegal is that the restraint is "conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." *United States v. Realty Multi–List, Inc.,* 629 F.2d 1351, 1362 (5th Cir.1980).

■ Claims under Section 2 of the Sherman Act, like Section 1 claims, also require that there be antitrust injury in a relevant market. *See, e.g., Jayco Systems, Inc. v. Savin Business Machines Corporation,* 777 F.2d 306, 320 (5th Cir.1985).

As noted, the issue raised by defendants is whether plaintiff has shown an anticompetitive injury in the relevant market. Plaintiff counters that not only has anticompetitive injury been shown but also that the alleged practices by defendants are *per se* illegal under Section 1 of the Sherman Act.

The Court first addresses whether the defendants' actions can fit within the narrow band of anticompetitive practices under Section 1 of the Sherman Act that are *per se* unlawful. The Court next discusses whether plaintiff can show an anticompetitive injury in the relevant market.

### III. *Per Se* Illegality

■ Judge Thornberry provided a concise description of *per se* illegal restraints in *E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 186 (5th Cir.1972) (citations omitted):

> Certain arrangements are conclusively presumed to be unreasonable restraints of trade, simply by virtue of their obvious and necessary effect on competition. Once the existence of such an arrangement has been established, no evidence of actual public injury is required, and no evidence of the reasonableness of defendant's conduct will be considered in justification. This rule of *per se* illegality has been applied thus far to horizontal and vertical price agreements, division of markets between competitors, tying arrangements, and certain collective refusals to deal, or "group boycotts." [7]

---

7. Horizontal combinations occur among traders at one level with a purpose to exclude direct competitors from the market. *Id.* Vertical combinations involve parties at different levels of the

In this case, Doctor's Hospital argues: "Because SMA is provider-controlled, because there are elements of a price-fixing agreement between SMA and [East Jefferson] and because the alleged restraint is a concerted refusal to deal, *per se* rules applies (sic) in this case." (Doctor's Hospital memorandum in opposition, p. 11, R.Doc. 262.) It is also important to note for present purposes what Doctor's Hospital has not alleged. Although it refers to price-fixing in its argument, Doctor's Hospital concedes that it has not alleged price-fixing. (Doctor's Hospital Reply Memorandum, p. 9, n. 5, R.Doc. ——.) Instead, Doctor's Hospital holds steadfast to the contention that it is the victim of a group boycott, or concerted refusal to deal under *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

In *Klor's* the plaintiff claimed that a chain of department stores, Broadway–Hale Stores, Inc., and their distributors conspired to restrain and monopolize commerce in violation of Sections 1 and 2 of the Sherman Act. *Id.* at 208, 79 S.Ct. at 707. Specifically, the plaintiff, which operated a retail appliance store, alleged that manufacturers of well-known appliances conspired among themselves and with Broadway–Hale "either not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms." *Id.* at 209, 79 S.Ct. at 708. Justice Black summarized the claim as follows:

Broadway–Hale has used its 'monopolistic' buying power to bring about this situation. The business of manufacturing, distributing and selling household appliances is in interstate commerce. The concerted refusal to deal with Klor's has seriously handicapped its ability to compete and has already caused it a great loss of profits, goodwill, reputation and prestige.

*Id.*

The district court granted summary judgment, and the court of appeals affirmed. *Id.* at 210, 79 S.Ct. at 708. The court of appeals held that there was no showing of public injury, *i.e.,* no showing that any act by defendants affected price, quantity or quality of products offered. *Id.* The Supreme Court disagreed, believing that "Klor's allegations clearly show one type of trade restraint and public harm the Sherman Act forbids. . . ." *Id.* Construing Sections 1 and 2 of the Sherman Act as analyzed the Supreme Court, Justice Black stated:

The Court [has] recognized that there were some agreements whose validity depended on the surrounding circumstances. It emphasized, however, that there were classes of restraints which from their 'nature or character' were unduly restrictive, and hence forbidden by both the common law and the statute.

*Id.* at 211, 79 S.Ct. at 709.

The Supreme Court held that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Id.* at 212, 79 S.Ct. at 709. It matters not whether the concerted refusals were reasonable or that there was a failure to show that there was price-fixing, a limiting of production or quality deterioration. *Id.* Even if the refusals resulted in stimulation of competition or lower prices, they are banned. *Id.* The Court found that the plaintiff's allegations constituted "such a boycott." *Id.*

This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer. This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products.

*Id.* at 212–13, 79 S.Ct. at 709–10.

While the question in this case—whether the defendants engaged in a *per se* illegal boycott of plaintiff—is obvious, the answer is not so. As Justice Brennan stated in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284,

market, designed to exclude direct competitors of some of the members of the vertical combina-

tion. *Id.*

294, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985), "[e]xactly what types of activity fall within this forbidden category is, however, far from certain." Not every such "cooperative activity" is *per se* illegal. *Id.* at 295, 105 S.Ct. at 2620. "A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have *predominantly* anticompetitive effects." *Id.* at 298, 105 S.Ct. at 2621 (emphasis added).[8]

Analyzing the facts of this case under the foregoing principles, the Court refuses to impose a *per se* rule of illegality. The first issue is whether East Jefferson and SMA comprise the "plurality of traders" necessary to constitute a group boycott. *Seagood Trading Corporation v. Jerrico, Inc.,* 924 F.2d 1555, 1567 (11th Cir.1991). "It is well established that a party 'may choose with whom he will do business and with whom he will not do business,' and that this behavior, referred to as 'exclusive dealing,' will not give rise to liability absent a showing of actual competitive injury." *Id.,* quoting *Construction Aggregate Transport, Inc. v. Florida Rock Indus., Inc.,* 710 F.2d 752, 772–73 (11th Cir.1983).[9]

In *Seagood Trading,* the plaintiffs alleged that, pursuant to an agreement with Long John Silvers, Inc. (hereinafter "LJS"), a food distributor, Martin–Brower Company (hereinafter "M–B"), refused to deal with them, resulting in an illegal *per se* group boycott. *Seagood Trading,* 924 F.2d at 1568. However, the court of appeals refused to find a *per se* antitrust violation.

LJS is not in the business of storing or delivering supplies; it relies on M–B to perform these services for it. Thus, M–B's refusal to provide them to the plaintiffs as well only amounted to one party's refusal

to deal with the plaintiffs; LJS did not refuse to provide these services to the plaintiffs. "That [LJS] may have instigated [M–B's] refusal to deal does not create the plurality of 'refusals' necessary for the arrangement to be called a group boycott." *Construction Aggregate Transp.,* 710 F.2d at 773. Rather, the alleged arrangement more closely resembles a unilateral refusal to deal. Because of this, we must analyze this claim under the rule of reason.

*Seagood Trading,* 924 F.2d at 1568.

For the same reason, this Court finds that the present alleged "arrangement" is more akin to a unilateral refusal by SMA to deal with Doctor's Hospital rather than a group boycott. Under the facts of this case, SMA terminated the "participating hospital" contract with Doctor's Hospital under a term of the contract which specifically provided for unilateral termination. There is no instance here of "concerted refusals by traders to deal with traders," *Klor's,* 359 U.S. at 212, 79 S.Ct. at 709. East Jefferson has not refused to deal with Doctor's Hospital; SMA did. Rather, this *is* analogous to a case of "a manufacturer and a dealer agreeing to an exclusive distributorship." *Id.*

This conclusion is correct even if East Jefferson instigated the termination of Doctor's Hospital, pursuant to not only *Seagood Trading* but also *Northwest Wholesale Stationers,* where Justice Brennan stated that motive is more properly evaluated under the "rule of reason" analysis. *Northwest Wholesale Stationers,* 472 U.S. at 297, n. 7, 105 S.Ct. at 2621.

The Court's decision to reject the attempt by Doctor's Hospital to apply *per se* unlawfulness is reinforced by *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589 (1st Cir.

---

**8.** In *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, n. 16, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), the Supreme Court stated: "Per se rules thus require the Court to make broad generalizations about the social utility of particular commercial practices. The probability that anticompetitive consequences will result from a practice and the severity of those consequences must be balanced against its procompetitive consequences."

**9.** The Court notes that *Construction Aggregate* relied not only on *Klor's* and other Supreme Court cases for this proposition but also on various Fifth Circuit cases, including *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 426–28 (5th Cir.1981) and *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004–07 (5th Cir.) *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). Thus, the Court comfortably relies on *Seagood Trading* and *Construction Aggregate* as consistent with Supreme Court and Fifth Circuit law on this issue.

1993), the most analogous case dealing with *per se* illegality in the realm of managed health care that has been cited by the parties or which this Court has been able to find. *Healthcare* involved a challenge to an exclusive dealing clause in the contracts between a health maintenance organization (HMO) and doctors who provided primary care for the HMO. *Id.* at 591. As the First Circuit noted, an HMO acts as both health insurer and provider, "charging employers a fixed premium for each employee who subscribes." *Id.* The HMO at issue contracted with independent doctors, who also continued to treat other patients, "in contrast to a 'staff' model HMO whose doctors would normally be full-time employees of the HMO." *Id.*[10]

The plaintiff in *Healthcare* attacked another HMO's exclusivity clause with its doctors, which provided that the doctors would receive greater compensation if they agreed not to perform services for any other HMO. *Id.* at 592–93. The First Circuit rejected the plaintiff's main argument that the exclusivity clause was a group boycott requiring "*per se* condemnation." *Id.* at 593. "We doubt that the modern Supreme Court would use the boycott label to describe, or the rubric to condemn, a joint venture among competitors in which participation was allowed to some but not all, although such a restriction might well fall after a more complete analysis under the rule of reason." *Id.* at 594.

The First Circuit also found that the agreement between the HMO and the doctors was a vertical arrangement, "by which (for example) a supplier or dealer makes an agreement exclusively to supply or serve a manufacturer, [and which] is not a group boycott." *Id.* Such a vertical agreement to exclusively supply or serve a manufacturer is not a group boycott. *Id.*, citing *Klor's*, 359 U.S. at 212, 79 S.Ct. at 709. *See also Sharp Electronics, supra* (vertical restraint not illegal *per se* absent agreement on price or price levels.).

The *Healthcare* court found that "the exclusivity arrangements challenged by U.S. Healthcare [were] vertical in form, that is, they comprise[d] individual promises to

Healthsource [the HMO] made by each doctor selecting the option not to offer his or her services to another HMO." *Healthcare*, 986 F.2d at 594.

The Court finds there is no material difference between *Healthcare* and the present case. Both U.S. Healthcare and Doctor's Hospital attack the exclusive agreements at issue. U.S. Healthcare contended that the HMO/doctor's agreement violated the antitrust laws. Doctor's Hospital claims that the SMA/East Jefferson agreement does the same. As in *Healthcare*, this Court finds that the "purely vertical" agreement between SMA and East Jefferson does not conflict with the antitrust laws so as to render it a *per se* violation.

■ Several concluding observations are necessary to dispose of this issue. The first is whether this case really presents a horizontal agreement because the health care providers sit on the board of directors of and control SMA. As Doctor's Hospital terms it, SMA is "provider-controlled." Again, turning to *Healthcare* for guidance, the Court agrees with the First Circuit, which addressed but dismissed a similar contention.

The closest that U.S. Healthcare gets to a possible horizontal case is this: it suggests that the exclusivity clause in question, although vertical in form, is in substance an implicit horizontal agreement by the doctors involved. U.S. Healthcare appears to argue that stockholder-doctors dominate Healthsource and, in order to protect their individual interests (as stockholders in Healthsource), they agreed (in their capacity as doctors) not to deal with any other HMO that might compete with Healthsource. We agree that such a horizontal arrangement, if devoid of joint venture efficiencies, might warrant *per se* condemnation.

The difficulty is that there is no evidence of such a horizontal agreement in this case. Although U.S. Healthcare notes that doctor-stockholders predominate on the Healthsource board that adopted the option, there is nothing to show that the

---

**10.** The court of appeals recognized that one of the alternatives to an HMO was a preferred provider organization, such as in the present case. *Id.*

clause was devised or encouraged by the panel doctors. On the contrary, the record indicates that Dr. Payson [U.S. Healthcare's founder] and Healthsource's chief operating officer developed the option to serve Healthsource's own interests. Formally vertical arrangements used to disguise horizontal ones are not unknown, but U.S. Healthcare has supplied us with no evidence of such a masquerade in this case.

*Id.* (Citation omitted.)

In the present case, while the "member" healthcare providers sit on SMA's board, there is no genuine issue of material fact that East Jefferson did not become a "member" hospital and thus could not have representatives on the board until after the SMA board voted to exclude Doctor's Hospital. Further, the record does not indicate—even though Doctor's Hospital argues that it does—that the SMA board conspired or acted out of fear of East Jefferson in accepting East Jefferson and jettisoning Doctor's Hospital from SMA.

Doctor's Hospital's main contention in this respect is that one board member, Hugh Wilson, the administrator of Lakeside Hospital, a specialty hospital offering gynecological and obstetrical services only, viewed East Jefferson as a "gorilla" that would "roll over" on Lakeside if Lakeside opposed East Jefferson's entry into SMA. However, a review of the administrator's deposition, from which this contention arises, does not justify the inference drawn by Doctor's Hospital. Wilson's statement, in pertinent part, in response to a question as to his concerns about East Jefferson's joining SMA:

> [W]hen I look at a market, any time, you know, you're in bed with a gorilla, you might get rolled over on, I guess was my kind of thinking on that, and with EJ coming into, you know, coming into the network, you know, I'm kind of the, let's say, the minor provider in the East Jefferson Parish, and I certainly had to be concerned for my organization.

(Deposition of Hugh Wilson, Exh. 60, p. 128, attached to R.Doc. 133.)

This statement only shows Wilson's fear of losing market power to East Jefferson and does not indicate that Lakeside "caved in" to East Jefferson's entry into the market out of fear of East Jefferson. Indeed, shortly afterward in his deposition, Wilson explains, that SMA decided not to allow East Jefferson to bring its obstetrics into SMA. *Id.* at pp. 164–66.

Doctor's Hospital's only other contention in regard to any alleged action by Lakeside is: "At some point during this time [East Jefferson] began negotiations to acquire Lakeside, and, ultimately, Lakeside dropped its opposition to the entry of [East Jefferson into SMA]." (Doctor's Hospital memorandum in opposition, p. 6, R.Doc. 262.) However, this is nothing more than a bald-faced allegation not supported by any affidavit, deposition, or otherwise so as to create a genuine issue of material fact on summary judgment.[11] As such, the Court declines to entertain it.

Therefore, as in *Healthcare*, there is no evidence of any horizontal violation by the SMA board, albeit "provider-controlled." The board's action in accepting East Jefferson and terminating Doctor's Hospital does not warrant imposition of a *per se* rule.

■ The second concluding observation as to the applicability of the *per se* rule results from plaintiff's contention that the element of price fixing converts the present case into one of *per se* illegality. This contention arises from a facsimile memorandum which Doctor's Hospital alleges clearly establishes price-fixing between SMA and East Jefferson. The memorandum, dated October 28, 1992, is from Barbara B. Louviere, SMA Executive Director, to Peter Betts, East Jefferson's President and CEO. (Exh. 27, R.Doc. 133.) The memorandum was a re-

---

11. This finding does not conflict with the Court's earlier ruling on a motion in limine on the same issue. The Court denied the defendant's motion in limine to prevent plaintiff from introducing evidence on this issue, finding the evidence potentially relevant. Obviously, at trial the Court would have required plaintiff to lay the proper foundation for the introduction of this evidence. On a motion for summary judgment, however, the non-mover has the burden of coming forward with proof in the form of depositions, affidavits, pleadings, etc., that supports its contentions. Fed.R.Civ.P. 56(c); *Liquid Air Corporation, supra.*

sponse to East Jefferson's own response to "our dilemma relative to rates" and stated: "Generally, East Jefferson's rates will be better accepted by our insurers, employers, and other payors, if they are not more than 10% higher than the rates of the current SMA hospital." *Id.* The memorandum continued: "The rates on the second page of this fax reflect rates faxed from East Jefferson on Tuesday, as well as suggested rates 10% higher than SMA's current hospital per diems."

Notwithstanding the fact, as noted, that Doctor's Hospital has not alleged price fixing as a separate cause of action, plaintiff's argument fails under *Broadcast Music, Inc. v. Columbia Broadcasting,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) and other later Supreme Court decisions. In *Broadcast Music* the Supreme Court addressed the issue of "whether the issuance by ASCAP [American Society of Composers, Authors and Publishers] and BMI [Broadcast Music, Inc.] to CBS of blanket licenses to copyrighted musical compositions at fees negotiated by them is price fixing *per se* unlawful under the antitrust laws." *Id.* at 4, 99 S.Ct. at 1554. Writing for the Court, Justice White recognized that "agreements among competitors to fix prices" on goods or services had been recognized as being among the restraints proscribed by the Court as *per se* unlawful. *Id.* at 8, 99 S.Ct. at 1556. Justice White cautioned, however, that "easy labels do not always supply easy answers." *Id.*

> As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable. The Court of Appeals' literal approach does not alone establish that this particular practice [at issue] is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming value." Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services, they are literally "price fixing," but they are not *per se* in violation of the Sherman Act. Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "*per se* price fixing."

*Id.* at 9, 99 S.Ct. at 1557. (Citation omitted.)

The Supreme Court examined the practices employed by ASCAP and BMI, keeping in mind that the Court only found relationships as *per se* violative of the Sherman Act after "considerable experience." *Id., quoting White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). The Court's analysis resulted in a holding that the blanket licenses were not *per se* unlawful. *Broadcast Music,* 441 U.S. at 24, 99 S.Ct. at 1565, especially in light of the blanket licenses' increase, not decrease, in economic efficiency and in their establishment of a market that previously did not exist under "individual licenses." *Id.* at 19–23, 99 S.Ct. at 1562–64.

In the present case, as shown, there is no "agreement between competitors." Rather, this is an agreement between SMA and East Jefferson, not between two hospitals in competition with Doctor's Hospital. Second, Doctor's Hospital has not shown—and this Court has not found—any cases where, on the basis of "considerable experience" courts have found exclusive agreements between preferred provider organizations and hospitals to constitute *per se* illegality under the Sherman Act, whether "price fixing" is involved or not.

This conclusion leads to the Court's last observation in regard to whether the alleged action between SMA and East Jefferson is *per se* illegal. Courts have refused to find that *per se* rules apply where, although facially there appears to have been antitrust violation, there is economic utility or competitive advantages to the alleged violation. *See, e.g., Broadcast Music, supra; Northwest Wholesale Stationers,* 472 U.S. at 294–298, 105 S.Ct. at 2619–2621 (mere allegation of concerted refusal to deal insufficient as not all concerted refusals to deal are plainly anticompetitive); *Continental T.V.,* 433 U.S. at 50, n. 16, 97 S.Ct. at 2557 (probability of anticompetitive consequences must be balanced against procompetitive consequences). *See also United States v. Realty Multi–List, Inc.,* 629 F.2d 1351, 1362–69 (5th Cir.1980)

(analyzing many Supreme Court cases that stand for this proposition and concluding that, although membership rules of real estate listing service literally constitute a group boycott, there is no *per se* violation of the Sherman Act because the listing service actually constitutes an "effective response to pervasive market imperfections in the real estate industry.")

In the present case, preferred provider organizations are an economic response to health care expenses, as are health maintenance organizations. *See U.S. Healthcare,* 986 F.2d at 591 (discussing present-day alternatives to traditional, "Norman Rockwell era" health care). *See also* Federal Trade Commission member Dennis A. Yao, Competition for Managed Health Care Contracts, Remarks Before Los Angeles Bar Association (April 16, 1993), *CCH Medicare and Medicaid Guide* (1993), Paragraph 14,185 at p. 13, 546 (HMOs and PPOs are "market response" to increasing costs that were inherent problem in "fee for service" system exemplified by traditional Blue Cross and Blue Shield policies) (Exh. 5, R.Doc. 247.) In the New Orleans area alone, there are 10 HMOs and 14 PPOs. (Exh. 3, R.Doc. 247.) This "market response" has been loud and clear in response to increasing medical costs. Therefore, this Court declines to find that the contracts between SMA and East Jefferson [12] and the termination of Doctor's Hospital are *per se* unlawful under the Sherman Act in view of the economic purposes of managed health care such as PPOs. On the present record, any anticompetitive effects, if they exist, do not predominate over procompetitive consequences. *Northwest Wholesale Stationers, supra.*

Therefore, this case is not one where *per se* rules of illegality under the Sherman Act should be applied.

## IV. Rule of Reason

■ The remaining issue is whether Doctor's Hospital can recover under the rule of reason. As noted, "[p]roof that the defendant's activities, on balance, adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason." *Hornsby Oil Company,* 714 F.2d at 1392. Plaintiff's expert defines the relevant market as acute care inpatient services and hospital-based outpatient services on the east bank of Jefferson Parish. (Report of Dr. Henry Zaretsky, pp. 14–15, Exh. 13, R.Doc. 247.) In his deposition, Dr. Zaretsky declined to state that the relevant market is was a sub-market for SMA consumers on the east bank of Jefferson Parish. (Deposition of Dr. Henry Zaretsky, p. 497, Exh. 14, R.Doc. 247.) Thus, the Court accepts Dr. Zaretsky's designation of the market and analyzes whether any antitrust injury occurs on the basis of the market for acute-care, inpatient services and hospital based outpatient services on Jefferson Parish's east bank.

According to Dr. Zaretsky's report, antitrust injury occurred in three ways when Doctor's Hospital was terminated from SMA: consumers would pay more; consumers had less choice; and Doctor's Hospital was weakened as a competitor. (Report of Dr. Zaretsky, pp. 21–25, Exh. 13, R.Doc. 247.)

Addressing this last contention first, Doctor's Hospital concedes that injury to a single competitor is not actionable. (Plaintiff's reply memorandum, R.Doc. 276, p. 12, n. 8.) *See, e.g., Green v. The State Bar of Texas,* 27 F.3d 1083, 1087 (5th Cir.1994) (conduct that might be detrimental to one competitor does not violate antitrust laws). However, Doctor's Hospital states that, under "appropriate circumstances," such action may violate the Sherman Act, citing *Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 963 (10th Cir1990). *Reazin* also recognized that "the adverse impact must be on competition, not on any individual competitor or on the plaintiff's business." *Id.* at 960. Yet, on the facts of *Reazin,* the Tenth Circuit found that the plaintiff, Wesley Medical Center, had standing and showed the requisite injury. *Id.* at 962.

In *Reazin* various plaintiffs [13] sued Blue Cross, alleging that, in order to send a mes-

---

**12.** Both the "participating hospital" contract and the "member hospital" contract.

**13.** Two plaintiffs were dismissed on summary judgment as lacking standing and a third was

sage to other hospitals that Blue Cross perceived as competitors, it agreed with two other hospitals which were Wesley's competitors to reduce the maximum payments allowable to the other contractors and to terminate Wesley's agreement with Blue Cross, resulting in a shift of patients from Wesley's to the other two hospitals. *Id.* at 954.

Blue Cross challenged Wesley's standing on the ground that it was not a consumer or a competitor in the relevant health care market of health care financing. *Id.* at 962. The court of appeals found that "Wesley's claimed injuries [14] were an 'integral aspect' of the conspiracy to restrain trade in the health care financing market. Indeed, Wesley was the direct victim of Blue Cross' actions. There was also evidence that Blue Cross specifically intended to harm Wesley." *Id.* at 963.

In the present case, however, Doctor's Hospital has failed to show that it has suffered any injuries that were an "integral aspect" of the market at issue, *i.e.*, the acute care and inpatient market on the east bank of Jefferson. Dr. Zaretsky's report simply states: "By being excluded from the *SMA market*, DHJ has suffered significant losses of revenues and profits." (Exh. 13, p. 25, R.Doc. 247.) (Emphasis added.) Yet, Dr. Zaretsky refused to state at his deposition that the relevant market was the SMA-patient market. Dr. Zaretsky then makes a logical leap by stating: "As such, [Doctor's Hospital's] status as a competitor in the geographic market is substantially weakened. The weakening of a competitor directly enhances the market power of a major beneficiary." *Id.* Notwithstanding that this last statement does not qualify as antitrust injury, *Green v. The State Bar of Texas, supra,* Dr. Zaretsky makes no showing as to how the loss of Doctor's Hospital's contract with SMA specifically is an "integral aspect" of its loss of market share on the east bank of Jefferson Parish. Indeed, as plaintiff points out, Dr. Zaretsky himself concluded that the portion of SMA revenue to the total revenue

of Doctor's Hospital was only six percent in 1993 at the termination of the contract. *Id.* at 8.

Moreover, in *Reazin,* the Tenth Circuit found that Blue Cross was the instigator of the conspiracy. Here, Doctor's Hospital contends that East Jefferson was behind the conspiracy to oust Doctor's Hospital from SMA. However, there is no evidence that SMA intended to harm Doctor's Hospital. The record is devoid of any proof that SMA acted to "send a message" to Doctor's Hospital that it should not do business with any of its competitors. Indeed, at the time of its termination from SMA, Doctor's Hospital had been under contract with another preferred provider organization, Healthcare Advantage, for six months. (Exh. 10, R.Doc. 247.) This occurred shortly after East Jefferson withdrew from Healthcare Advantage as a "sponsoring hospital." (Exh. 9, R.Doc. 247.)

Therefore, the Court finds *Reazin* factually inapposite to the present case.

The next issue is whether consumers would pay more in the relevant market because of the exclusion of Doctor's Hospital and the inclusion of East Jefferson in SMA. The parties dispute whether East Jefferson's prices to SMA customers are higher or lower than those of Doctor's Hospital. The Court need not decide this issue because, taking the relevant market as the east bank of Jefferson Parish, plaintiff presents no concrete evidence that the cost of health care services would rise as a result of the SMA–East Jefferson contract. This is shown by Dr. Zaretsky's statement that "studies suggest that the success of [East Jefferson] and SMA in eliminating [Doctor's Hospital] as a competitor is *likely* to lead to an increase in prices of all hospitals in the geographic market, not to mention prices paid by SMA members to its contracting hospitals." (Exh. 13, p. 24, R.Doc. 247, emphasis added.) Dr. Zaretsky also stated in his report that "[b]y eliminating competition, the termination of

---

found by the jury to have suffered no antitrust injury, leaving Wesley's contentions at issue on appeal. *Id.* at 956, nn. 2 and 3.

14. These injuries included having to advertise to reassure patients that Blue Cross subscribers were still welcome at Wesley, reducing prices to retain market share, and sustaining a loss in patients. *Id.* at 962.

[Doctor's Hospital] immediately harmed consumers by creating an environment *conducive to* increased prices." *Id.* at 23 (emphasis added).

Such speculative statements about anticompetitive effects are insufficient to create antitrust injury. *Roy B. Taylor Sales, Inc. v. Hollymatic Corporation*, 28 F.3d 1379, 1385 (5th Cir.1994). The Fifth Circuit has "narrowly interpreted the meaning of antitrust injury, excluding from it the *threat* of antitrust injury." *Anago*, 976 F.2d at 249. (Emphasis added.) The Court holds that the mere "likelihood" that prices will increase or that an environment is "conducive" to increased prices for inpatient and outpatient hospital care on the east bank of Jefferson falls short of the strict Fifth Circuit standard for showing antitrust injury.[15]

The final area of purported antitrust injury, according to Dr. Zaretsky, is that consumers will have less choice. Specifically, Dr. Zaretsky contends that excluding Doctor's Hospital from SMA reduces "the SMA subscribers' choices among providers (hospitals and some physicians). This reduces both price and nonprice competition." (Exh. 13, p. 24, R.Doc. 247.) This contention fails to establish antitrust injury for several reasons. First and foremost, it does address antitrust injury in the relevant market but only in the market for SMA subscribers. Second, according to the deposition of the former chairman of Doctor's Hospital, nearly all the doctors on staff at Doctor's Hospital are also on staff at East Jefferson. (Exh. 27, p. 23, R.Doc. 247.) Thus, there does not appear to be any reduction in physician choice either.

Doctor's Hospital makes several other arguments in opposing plaintiffs' motion which merit consideration by this Court. First, in regard to the "choice" issue, Doctor's Hospital contends that consumers are being deprived of the hospital of their choice and that consumers would choose Doctor's Hospital over East Jefferson because it is less expensive, more efficient, more comfortable, smaller and less bureaucratic. (Plaintiff's reply memorandum, R.Doc. 276, p. 17, n. 11.) Notwithstanding that the parties dispute which hospital is less expensive, Doctor's Hospital's other allegations have no basis in the form of affidavits, depositions, or otherwise necessary under Fed.R.Civ.P. 56(c) for them to be considered on this motion for summary judgment.

Doctor's Hospital also relies heavily on *Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440 (9th Cir.1988) in support of its argument that there has been a loss of choice for the consumer sufficient to establish antitrust injury. However, *Oltz* also is inapposite. There, a hospital in Helena, Montana, which enjoyed a market share of 84% of general surgical services, terminated a nurse anesthetist's billing contract and entered into an exclusive contract with a group of anesthesiologists. *Id.* at 1442–44. The district court instructed the jury that the relevant market was the Helena area. *Id.* at 1446. "[T]here was no evidence that patients could effectively turn outside of [the defendant hospital] for alternate sources of anesthesia services." *Id.* at 1447.

That is not the case here. According to Dr. Zaretsky's report, there are six hospitals on the east bank of Jefferson; further, East Jefferson's market share, though large at 42 percent, is less than half of the market. (Table 1, Exh. 13, R.Doc. 247.) Moreover, because most, if not all, of the physicians are on staff at both East Jefferson and Doctor's Hospital, as shown above, the injury to consumer choice is negligible, if it exists at all.

Therefore, because Doctor's Hospital has shown no anticompetitive injury in the relevant market, summary judgment is appropriate as this is a necessary element in actions brought under Sections 4 and 16 of the Clayton Act. *Liquid Air, supra.* Doctor's Hospital does not possess antitrust standing. This conclusion applies not only to plaintiff's Section 1 claims but also to the Section 2 claims, for Doctor's Hospital must show anti-

**15.** To the extent that plaintiff argues in its opposition memorandum that the 10% increase in prices as set forth in the Louviere–Betts memorandum is also evidence of anticompetitive ef-, fects, this argument also fails because it is factually limited only to the SMA market, not the market on the east bank of Jefferson.

trust injury in the relevant market. *Jayco, supra.*

### V. Louisiana Antitrust Violations

It is well-established that Louisiana antitrust laws are construed in accord with federal antitrust law. *See Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So.2d 1149, 1158 (La.1986); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1003 (5th Cir.1981). Therefore, because the Court finds that Doctor's Hospital cannot bring its claim under a *per se* rule of illegality and because plaintiff does not have standing under federal law, the Court finds that defendants are entitled to summary judgment on Doctor's Hospital's antitrust claims under Louisiana law.

### VI. East Jefferson's Motion for Partial Summary Judgment

As noted East Jefferson also has filed a motion for partial summary judgment, contending that because it is a political subdivision it is immune from damages and/or liability under state and federal antitrust laws. However, because the Court rules in favor of SMA and East Jefferson on their partial summary judgment on antitrust standing, the Court denies East Jefferson's motion for partial summary judgment as moot.

Accordingly,

IT IS ORDERED that "Defendants' Second Motion for Partial Summary Judgment" is GRANTED.

IT IS FURTHER ORDERED that "East Jefferson's Motion for Partial Summary Judgment" is DENIED as MOOT.